UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MICHELLE WATKINS,[1]          )
                              )
              Plaintiff,      )
                              )
v.                            )          No. 3:12-CV-243
                              )          (VARLAN/SHIRLEY)
CAROLYN W. COLVIN,            )
Commissioner of Social Security,  )
                              )
              Defendant.      )


**<u>MEMORANDUM AND ORDER</u>**

This case is before the Court on plaintiff's Motion for Summary Judgment and

Brief in Support [Docs. 13 and 14] and Defendant's Motion for Summary Judgment and

Memorandum in Support [Docs. 20 and 21]. Plaintiff Michelle Watkins ("plaintiff")

seeks judicial review of the decision by the Administrative Law Judge ("ALJ"), the final

decision of the Defendant Carolyn W. Colvin, Commissioner of Social Security ("the

Commissioner").

On August 28, 2008, Ms. Burkhart filed an application for a period of disability,

disability insurance benefits, and/or supplemental security income,[2] claiming a period of

disability which began on August 1, 1998 [Tr. 125-34]. She later amended the alleged

---

[1] On April 1, 2013, the Court substituted [Doc. 23] Michelle Watkins, the only daughter of Plaintiff Tammy Burkhart, as the Plaintiff in this action. Ms. Burkhart passed away on December 18, 2012, and therefore, as the sole survivor, Ms. Watkins has standing to challenge the denial of Social Security Disability Insurance Benefits ("DIB") but not Supplemental Security Income ("SSI"). *See* Memorandum and Order [Doc. 23].

[2] As explained in the Memorandum and Order [Doc. 23], Ms. Watkins does not have standing to challenge the denial of SSI.

onset date to January 1, 2007 [Tr. 124]. After her application was initially denied and denied again upon reconsideration, Ms. Burkhart requested a hearing [Tr. 96-97]. On September 28, 2010, a hearing was held before an ALJ to review Ms. Burkhart's claim [Tr. 35-65]. On January 7, 2011, the ALJ found that Ms. Burkhart was not disabled [Tr. 11-34]. The Appeals Council denied Ms. Burkhart's request for review; thus, the decision of the ALJ became the final decision of the Commissioner.

Plaintiff now seeks judicial review of the Commissioner's decision.

## I.    ALJ FINDINGS

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following combination of "severe" impairments: *diabetes mellitus; obesity; asymptomatic hepatitis C; moderate left foraminal stenosis at C5-6; thrombocytopenia; conversion disorder; bipolar II disorder; an anxiety disorder, not otherwise specified; and a personality disorder, not otherwise specified, with histrionic features* (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform *medium* work as defined in 20 CFR

2

404.1567(c) and 416.967(c) except that she should never climb ladders[,] ropes or scaffolds; has limited far acuity; and should avoid exposure to work hazards, i.e., machinery, heights, etc. Additionally, she has limited, but satisfactory abilities to understand, remember, and carry out simple instructions; use judgment; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. She is able to adapt to the mental demands for unskilled work as outlined pursuant to SSR 85-15.

6. The claimant is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 25, 1959[,] and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable jobs skills (SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[Tr. 14-30].

## II.    DISABILITY ELIGIBILITY

To qualify for SSI benefits, a plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  An individual is eligible for SSI if he has financial need and he is aged, blind, or under a disability.  *See* 42 U.S.C. § 1382(a).

"Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  An individual shall be determined to be under a disability only if his physical and/or mental impairments are of such severity that he is not only unable to do his previous work, but also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous

4

period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520).

A claimant bears the burden of proof at the first four steps. *Id.* The burden of proof shifts to the Commissioner at step five. *Id.* At step five, the Commissioner must prove that there is work available in the national economy that the claimant could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

## III. STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. *Warner v. Comm'r of Soc. Sec.*,

5

375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters*, 127 F.3d at 528.

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.

2004). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." *Wilson*, 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. *See id.* at 547.

On review, plaintiff bears the burden of proving her entitlement to benefits. *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (citing *Halsey v. Richardson*, 441 F.2d 1230 (6th Cir. 1971)).

## IV.    POSITIONS OF THE PARTIES

Plaintiff requests that the Court reverse the Commissioner's decision denying benefits. In the alternative, she requests that the case be remanded pursuant to 42 U.S.C. § 405(g). Plaintiff makes four specific objections to the ALJ's finding. First, she argues that the ALJ failed to properly weigh the evidence from Ms. Burkhart's treating mental health provider [Doc. 14 at 14-19]. Second, she states that the ALJ's conclusion that Ms. Burkhart could perform unskilled work is not supported by the record [*Id.* at 18]. Third, she contends that the ALJ's creditability finding was not supported by substantial evidence [*Id.* at 20]. Finally, she asserts that the ALJ failed to request testimony from a vocational expert [*Id.* at 22].

7

The Commissioner responds that the ALJ considered and rejected the opinions of Ms. Burkhart's mental health providers and that the ALJ's decision is supported with substantial evidence [Doc. 21 at 5-10]. In addition, the Commissioner argues that the ALJ properly evaluated Ms. Burkhart's credibility [*Id.* at 10-15]. Furthermore, the Commissioner asserts that the ALJ did not commit error when she relied on the grids [*Id.* at 15-19].

## V.    ANALYSIS

The Court will address each of plaintiff's arguments in turn.

### A.    Mental Health Providers

Plaintiff argues that the ALJ failed to properly weigh the evidence from Ms. Burkhart's treating mental health providers at the Helen Ross McNabb Center ("HRMC")—namely, John Oglesby, B.A., and Angela Clement, R.N [Doc. 14 at 16]. In addition, plaintiff argues that the ALJ erred by giving one Clinically Related Group ("CRG") form greater weight than Ms. Clement's CRG form [*Id.* at 17]. The Commissioner responds that the ALJ properly considered and rejected Mr. Oglesby's and Ms. Clement's opinions and that plaintiff's argument regarding the CRG form has no legal support [Doc. 21 at 5-10].

The Court will first address the weight given to Mr. Oglesby's and Ms. Clement's opinions, and then analyze the arguments with regard to the disputed CRG form.

8

### 1.    Angela Clement, R.N., and John Oglesby, B.A.

In 2008, Ms. Clement's notes show that Ms. Burkhart was normal in a majority of the objective findings,[3] except mood and appearance [Tr. 412, 417, 424, 429].  Ms. Burkhart's mood was usually depressed, anxious, or both [Tr. 412, 417, 424, 429].  On some occasions, Ms. Burkhart appeared unkempt [Tr. 417, 429].  However, on other occasions, she was neat, clean, and wore make-up [Tr. 412, 424].  On March 5, 2008, Ms. Clement tried to encourage Ms. Burkhart to complete paperwork for the Pharmaceutical Assistance Program [Tr. 430].  Ms. Burkhart was repeatedly non-compliant with her diabetic medication, and she stopped going to the health department because she experienced long waiting times [Tr. 430].  About a month later, Ms. Burkhart told Ms. Clement that she had been in the hospital for eight days and was diagnosed with Parkinson's disease [Tr. 418].  Ms. Clement noted that there was no paperwork to confirm this diagnosis [Tr. 418].  On July 29, 2008, Ms. Burkhart reported having panic attacks and increased depression but no physical problems [Tr. 412-13].

---

[3] Categories in the objective findings include appearance, behavior, speech, mood, affect, thought processes, thought content, orientation, hallucinations, alcohol and drug use, tobacco, caffeine, illegal drugs, sleep, appetite, medical problems, medical compliance, medication side effects, and body type (i.e., weight, height).  For purposes of this Memorandum and Order, and unless otherwise noted, the Court will only discuss the following categories, which all relate to Ms. Burkhart's mental health and are usually the only categories that the social worker rates: appearance, behavior, speech, mood, affect, thought processes, thought content, orientation, hallucinations.  The Court also notes that the Plaintiff always denies alcohol and illicit drug use but admits to heavy cigarette (i.e., three to four packs a day) and caffeine (i.e., ten cans of diet coke a day) use [Tr. 429].

On June 6, 2008, Ms. Clement completed a Clinically Related Group ("CRG") form [Tr. 414-16]. Ms. Clement noted that Ms. Burkhart experienced moderate difficulties completing activities of daily living; concentrating, performing tasks, keeping pace; and adapting to change[4] [Tr. 414-15]. She concluded that Ms. Burkhart suffered from a severe and persistent mental illness [Tr. 415].

On April 16, 2009, Ms. Clement completed another CRG form. [Tr. 697-99]. Ms. Clement reported that Ms. Burkhart's ability to perform activities of daily living was markedly limited [Tr. 697].[5] She explained that Ms. Burkhart had "poor self-care, poor housekeeping ability, difficulty with transportation and bill paying. No income, receives food stamps, assistance from community" [Tr. 697]. Ms. Clement also stated that Ms. Burkhart displayed marked limitations in interpersonal functioning [Tr. 697]. She explained that Ms. Burkhart reported having no emotional support, had limited interaction with others, and that she tended to isolate [Tr. 697]. Ms. Clement stated that Ms. Burkhart's ability to concentrate, perform tasks, and keep pace was moderately limited because of her depression and anxiety [Tr. 698]. Finally, Ms. Clement noted that Ms. Burkhart experienced marked limitations in the ability to adapt to change [Tr. 698].

---

[4] On the form, "moderate" with regard to daily activities and interpersonal functioning is defined as having "regular or frequent problems with performing daily routine activities and . . . unable to perform up to acceptable standards without frequent assistance" [Tr. 414]. With regard to concentration, task performance, and pace, "moderate" is defined as having "regular or frequent difficulty with concentration and can complete [s]imple tasks within time frames and/but needs prompting and help" [Tr. 415]. Finally, with regard to the ability to adapt to change, "moderate" is defined as having "regular or frequent difficulty in accepting and adjusting to change; adaption will require some intervention" [Tr. 415].

[5] On the form, "marked" is defined as having "extensive problems with performing daily routine activities and requires frequent assistance" [Tr. 697].

10

Ms. Clement explained that Ms. Burkhart had poor coping skills and that stress caused increased depression and agitation [Tr. 698]. In addition, Ms. Burkhart had crying spells, slept poorly, and experienced panic attacks when she was stressed or when something had changed [Tr. 698]. Ms. Clement again concluded that Ms. Burkhart's impairments were severe [Tr. 698].

In 2009 and 2010, most categories on Ms. Clement's case notes were rated as normal [Tr. 659, 679, 695, 715, 728]. Ms. Burkhart's appearance was disheveled or unkempt on some occasions [Tr. 715, 728], and neat and clean on others [Tr. 659, 679, 695]. Her mood was usually depressed, anxious, or both [Tr. 659, 695, 715, 728]. On June 10, 2009, Ms. Burkhart reported feeling depressed and anxious and stated that she was not taking her medication because she had the stomach virus. [Tr. 696]. Ms. Clement explained the importance of taking medications [Tr. 696]. Several months later, Ms. Burkhart reported feeling good because she received money for Sinemet, and the medication was helping [Tr. 680]. She stated that she was a totally different person on Sinemet [Tr. 680]. On April 27, 2010, Ms. Clement reported that Ms. Burkhart's abilities to concentrate and complete tasks were fair [Tr. 659]. On the same day, Ms. Burkhart stated that she was "doing poorly" [Tr. 660]. She talked about her financial difficulties and how her brother told people at her church that she was the "kind of person that wouldn't help herself" [Tr. 660]. Ms. Clement noted that Ms. Burkhart complained that she could not afford her $3 co-payment for Hydroxyznie but she smoked a pack of

11

cigarettes a day [Tr. 660].[6] Ms. Burkhart stated that she helped her ill neighbor bathe, change bed linens, and took care of her neighbor's pets in exchange for money to buy cigarettes [Tr. 660]. In July, Ms. Clement stated that Ms. Burkhart's abilities to concentrate and complete tasks were poor [Tr. 631].

Mr. Oglesby began seeing Ms. Burkhart on January 21, 2010 [Tr. 721]. Throughout his visits with her, he noted that her appearance was either unkempt or disheveled, her behavior was restless and fidgety, and that her mood was depressed and anxious [Tr. 627-30, 633-56, 664-73, 711-14, 717-22]. All other categories were normal, except that on several occasions she displayed suicidal ideation, but did not have actual plans to commit suicide [Tr. 643, 655, 719]. On April 2, 2010, Mr. Oglesby noted that Ms. Burkhart displayed difficulties completing activities of daily living and that her home was unkempt [Tr. 673]. He also noted that she had a few neighbors that she saw on occasion and that she enjoyed watching television and movies, working on the computer and the internet, and taking care of her four pets [Tr. 673]. He stated that Ms. Burkhart depends on community resources and that she is not interested in working because her physical health was "not good" [Tr. 673]. Several months later, he reported that Ms. Burkhart was working in her yard when he arrived [Tr. 627].

_____

[6] On the same day another nurse noted that Ms. Burkhart reported that her stressors included financial strain and she was behind on paying her bills [Tr. 657]. The nurse stated that Ms. Burkhart was angry because the HRMC would not give her extra bus passes [Tr. 657]. In addition, the nurse noted that "[i]t appears [Ms. Burkhart] would be able to work at least part time, but she refuses to do so" [Tr. 657].

12

The majority of Mr. Oglesby's notes focus on Ms. Burkhart's financial hardship. Mr. Oglesby told Ms. Burkhart that she needed to look for work on several occasions, and he insisted that she also contact vocational rehabilitation [Tr. 636, 640, 642, 644, 646, 648, 650, 654]. On one specific occasion, Mr. Oglesby told Ms. Burkhart that HRMC had already helped her and would not be able to do so again [Tr. 654]. When Ms. Burkhart stated that she did not know anyone else who could pay her utility bill, Mr. Oglesby "advised [her] that this was a pattern that had to stop" [Tr. 654]. Ms. Burkhart told Mr. Oglesby that she was looking for work but that no one was hiring [Tr. 640]. She also told Mr. Oglesby that she had applied for jobs [Tr. 646]. Ms. Burkhart stated that an inventory company was willing to hire her at any time, but she stated that she could not go to work without power [Tr. 650]. When Ms. Burkhart requested that Mr. Oglesby contact a vocational rehabilitation agency, Mr. Oglesby advised her that contacting the agency was something that she needed to do herself [Tr. 650].

On March 30, 2010, Mr. Oglesby completed a CRG form [Tr. 706-08]. Mr. Oglesby gave Ms. Burkhart marked limitations in activities of daily living; interpersonal functioning; and the ability to adapt to change [Tr. 706-07]. He also noted that she displayed moderate difficulties with the ability to concentrate, perform tasks, and keep pace, because she reported having poor concentration and memory and she left tasks unfinished [Tr. 707]. With regard to activities of daily living, he explained that Ms. Burkhart experienced difficulty completing them, her home was unkempt, and that she was unable to clean [Tr. 706]. He also noted that Ms. Burkhart was able to take

13

transportation, did not have income, and that she relied on the community to pay her bills [Tr. 706]. With regard to interpersonal functioning, he noted that Ms. Burkhart is isolated in the community and that her neighbors check on her [Tr. 706]. He also stated that Ms. Burkhart assists her neighbor, who is in a wheelchair [Tr. 706]. He reported that Ms. Burkhart did not have family that she associated with and that she slept during the day to avoid people [Tr. 706]. Finally, when discussing Ms. Burkhart's ability to adapt, Mr. Oglesby stated that she had difficulty and that increased stress levels led to increased depression, anxiety, suicidal thoughts, and decreased daily functioning [Tr. 707].

The ALJ stated that she gave little weight to the CRG forms completed by Mr. Oglesby and Ms. Clement [Tr. 28].[7] The ALJ explained that neither person is a medical source and that only medical sources can give medical opinions [Tr. 28]. In addition, she noted that their "assessments are overly-restrictive and inconsistent with the preponderance of the other substantial evidence of record, particularly the associated case management records" [Tr. 28].

Pursuant to 20 C.F.R. § 404.1502, an acceptable medical source includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *See also* 20 C.F.R. § 404.1513. Registered nurses and case managers are absent from the definition of acceptable medical sources, and therefore, their opinions are not entitled to controlling weight. Social Security

---

[7] According to the record, Ms. Clement completed two CRG forms. [Tr. 414-15, 697-99]. One was completed in 2008 [Tr. 414-15], and one was completed in 2009 [Tr. 697-99]. It appears that the ALJ gave little weight to the 2009 CRG form, which stated that Ms. Burkhart displayed marked, rather than moderate, limitations in several areas.

14

Ruling 06-03p, however, states that the same factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) "can be applied" in determining the weight to be afforded to findings by other sources. These factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5 (2006). Even though an ALJ should consider the above factors, Social Security Ruling 06-03p states that only "acceptable medical sources" can establish a medically determinable impairment, be considered treating sources entitled to controlling weight, and give medical opinions. SSR 06-03p, 2006 WL 2329939, at *2.

The Court finds that the ALJ explained the reasons for giving little weight to Ms. Clement's and Mr. Oglesby's CRG forms and that substantial evidence supports the ALJ's findings. Both forms appear overly-restricted compared with other case management records. Although records show that Ms. Burkhart had some mental impairments, the case management records also show that many of Ms. Burkhart's problems stemmed from her financial condition. For instance, on October 19, 2007, a licensed social worker noted that Ms. Burkhart was depressed and anxious and that her

appearance was bizarre [Tr. 441].[8]  The meeting focused on Ms. Burkhart's financial issues because she was upset that she did not have money for gas, food, and her utility bill [Tr. 442].  In addition, she was upset because she had an interview with Brinks Security in Oak Ridge, Tennessee, but was unable to arrange a way to get there [Tr. 442]. During the next visit, Ms. Burkhart reported that her brother gave her gas money [Tr. 440].  A few days later, when Ms. Burkhart thought that she had the job with Brinks Security, the same licensed social worker noted that all categories were normal, including appearance and mood [Tr. 438].  Ms. Burkhart reported that she was happy because someone paid her utility bill, she was awarded food stamps, and "she can now eat what she 'wants to eat'" [Tr. 438].  The social worker set a goal for Ms. Burkhart to find other work if she did not get the job with Brinks Security [Tr. 438].

The Court also notes that the day Mr. Oglesby completed his CRG form, he visited Ms. Burkhart [Tr. 704-05]. She told Mr. Oglesby that she took his advice to clean her house. [Tr. 704]. She also claimed that she was creating a website on the internet so people could read her poems and so she could solicit donations for dental work [Tr. 704]. Mr. Oglesby talked to Ms. Burkhart about seeking part-time work, but she stated no one would hire her because of her teeth [Tr. 705].  Mr. Oglesby suggested several places to apply, "but [she] had a reason not to try[] either one" [Tr. 705].  He encouraged Ms. Burkhart to contact vocational rehabilitation [Tr. 705].  In fact, Mr. Oglesby suggested

---

[8] The Court also notes that a month prior, the licensed social worker visited Ms. Burkhart at her job [Tr. 447]. Although Ms. Burkhart reported feeling depressed because it was her birthday and her mother was not there to celebrate, she was rated normal in all categories, including appearance [Tr. 447].

Ms. Burkhart find work on many different occasions or at least contact vocational rehabilitation [Tr. 636, 640, 642, 644, 646, 648, 650, 705]. Mr. Oglesby's restrictions on the CRG form seem to be inconsistent with his many suggestions that Ms. Burkhart should find work. Finally, the Court also notes that both Ms. Clement and Mr. Oglesby explained that Ms. Burkhart had difficulty with activities of daily living because of her financial situation and not solely due to her alleged disabilities [Tr. 697, 706]. Accordingly, the Court finds that the ALJ did not commit error.

Plaintiff also asserts that the ALJ ignored the objective findings on the case managers' notes [Doc. 14 at 18]. However, it is well-established that the ALJ is not required to comment on all the evidence in the record. *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."). In addition, the Court notes that it is clear that the ALJ did not ignore the case managers' notes from HRMC because she summarizes them throughout the decision. Accordingly, the Court finds plaintiff's argument unavailing.

### 2. Sharon Sanders's CRG Form

Plaintiff argues that the ALJ erred by giving Ms. Sanders's CRG form greater weight than Ms. Clement's CRG form [Doc. 14 at 17]. Essentially, she argues that since both CRG forms were completed by registered nurses, they should be given the same weight.

17

The Court finds no legal support for plaintiff's position. Ms. Clement's CRG form gives Ms. Burkhart marked limitations in several areas, while Ms. Sanders's CRG form gives Ms. Burkhart only moderate limitations [Tr. 461-63, 697-99]. The ALJ is not required to give sources the same weight based upon their title. The ALJ should examine not only a source's title, but other factors as well. *See* 20 C.F.R. §404.1527(c). The other factors determine whether one opinion is entitled to greater weight than another. Accordingly, plaintiff's argument is without merit.

Finally, plaintiff asserts that when interpreting Ms. Sanders's CRG form, the ALJ wrongfully assumed that a "moderate limitation" on the form is the same as a "moderate limitation" in Social Security cases [Doc. 14 at 15]. Plaintiff argues that the definition used by Ms. Sanders suggested a more serious limitation than the ALJ's definition of "moderate." [*Id.*].

Ms. Sanders completed a CRG form on July 11, 2007 [Tr. 461-63]. When explaining her assessment, Ms. Sanders cited notes made on May 22, 2007 [Tr. 466-68]. On May 22, 2007, Ms. Burkhart stated she was dealing with a number of stressors, including the inability to pay the utility bill and other bills [Tr. 466]. She also reported that she was having a difficult time dealing with her mother's death [Tr. 466]. With regard to activities of daily living, the social worker explained that Ms. Burkhart lives in her mother's house, receives food stamps, and receives assistance from her case managers [Tr. 466]. With regard to interpersonal functioning, the social worker reported Ms. Burkhart had a "very conflictual relationship" with her brother and that Ms.

18

Burkhart's mother passed away three years ago [Tr. 466]. Ms. Burkhart reported that she felt alone, but she had a relationship with a couple in her neighborhood [Tr. 466]. With regard to concentration, persistence, and pace, Ms. Burkhart stated that her ability to concentrate was fair and that she could complete most simple tasks [Tr. 466]. She also reported, however, that her ability to concentrate has declined due to recent stress [Tr. 466]. Finally, with regard to the ability to adapt, Ms. Burkhart reported that she was dealing with a number of stressors, including the inability to pay for basic needs and the conflict with her brother [Tr. 466]. She claimed that these stressors contributed to increased depression and anxiety [Tr. 466-67]. Ms. Sanders concluded that Ms. Burkhart experienced moderate difficulty in the following areas: activities of daily living; interpersonal functioning; concentration, performing tasks, keep pace; and adapting to change [Tr. 461-62].

As mentioned above, "moderate" on the CRG form, with regard to activities of daily living and interpersonal functioning, is defined as having "regular or frequent problems with performing daily routine activities and . . . unable to perform up to acceptable standards without frequent assistant" [Tr. 461]. With regard to the ability to concentrate, perform tasks, and keep pace, "moderate" is defined as having "regular or frequent difficulty with concentration and can complete simple tasks within time frames and/but needs prompting and help" [Tr. 461-62]. Finally, with regard to the ability to adapt to change, "moderate" is defined as having "regular or frequent difficulty in accepting and adjusting to change; adaption will require some intervention" [Tr. 462].

The ALJ stated that Ms. Sanders's CRG assessment indicated that Ms. Burkhart "was only moderately limited in the domains of activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaption to change" [Tr. 22-23]. The ALJ gave the CRG assessment great weight because of Ms. Sanders's treating relationship with Ms. Burkhart and the CRG assessment was consistent with the record as a whole [Tr. 23].

The Regulations do not define the term "moderate." Some courts have endorsed the view that "moderate" means a person can still perform satisfactorily. *Cantrell v. McMahon*, 227 F. App'x 321, 322 (5th Cir. 2007) (upholding the use of following definition of "moderate": "there are some moderate limitations, but the person can still perform the task satisfactorily"); *see also Hendrickson v. Comm'r of Soc. Sec.*, No. 11-14047, 2012 WL 4006702, at *9 (E.D. Mich. Aug. 16, 2012). In any event, however, even if Ms. Sanders suggested a more serious limitation, her notes indicate that Ms. Burkhart's problems stemmed from her financial condition. For example, the notes with regard to Ms. Burkhart's activities of daily living relate only to Ms. Burkhart receiving financial assistance [Tr. 466]. The notes fail to mention anything about Ms. Burkhart's alleged mental impairments, except that she feels alone [Tr. 466]. She also reported increased depression and anxiety because of her inability to pay for basic needs and a

conflict with her brother [Tr. 466]. Therefore, even if Ms. Sanders's limitations were more serious than what the ALJ found, the error is harmless because Ms. Sanders's assessment shows Ms. Burkhart was limited due to her financial condition, not her alleged disabilities. The Court also notes that the ALJ relied on other evidence to support her finding that Ms. Burkhart experienced only moderate limitations, such as the ALJ's own review of the entire record and the opinions of the state agency psychological consultants [Tr. 18].

**B.      Additional Evidence**

Plaintiff argues that the ALJ's conclusion that Ms. Burkhart could perform unskilled work is unsupported by the record [Doc. 14 at 18]. She asserts that substantial medical records were submitted after the residual functional capacity assessments were completed by the state agency medical and psychological consultants [*Id.* 18-19]. Plaintiff states that "it would have been appropriate for a [m]edical [e]xpert to review the evidence and give an opinion about the claimant's mental health and its impact on her functioning" [*Id.* at 19].

Plaintiff does not explain why the other evidence would change the state agency medical and psychological consultants' opinions nor does she explain what evidence to which she is specifically referring. It appears that plaintiff is referring to the 2009 to

21

2010 notes from HRMC, which involves her mental health.[9]  After reviewing these notes, however, the Court finds plaintiff's argument is not well-taken for several reasons.

First, on July 22, 2009, George Davis, Ph.D., reviewed the additional notes from HRMC and found that the original decision submitted on October 20, 2008 (Dr. Breslin's assessment) was affirmed [Tr. 571].  The 2009 HRMC notes include Ms. Clement's CRG form, in which she gave Ms. Burkhart marked limitations in several areas.  Therefore, after reviewing the CRG form and other HRMC notes from 2009, Dr. Davis opined that Ms. Burkhart's impairments were not disabling [Tr. 571].

Second, as mentioned above, most of the case manager notes from 2009 to 2010 focus on Ms. Burkhart's financial situation, not her alleged mental impairments.  For example, on November 25, 2009, she was normal in all categories, and the visit focused on her financial situation [Tr. 736-37].  On December 16, 2009, Ms. Burkhart was normal in all categories, except her affect was flat [Tr. 734].  Ms. Burkhart reported that she was not as depressed and that having money had decreased her stress [Tr. 735].  In addition, on January 5, 2010, she reported her medications improved her depression [Tr. 725].  Later, in March, she stated that she had ongoing anxiety because of external stressors [Tr. 716].  The case manager noted that this was a typical pattern for Ms. Burkhart [Tr. 716].

---

[9] There were also medical records from Cherokee Health Systems and University of Tennessee Memorial Hospital ("UT Hospital") submitted after the experts' review. These records involve Ms. Burkhart's physical condition. On April 13, 2010, Ms. Burkhart's blood sugar and liver functions tests were abnormal [Tr. 605].  The doctor increased her diabetes medication and suggested that she have an ultrasound performed [Tr. 605].  UT Hospital's medical records show that on June 11, 2010, Ms. Burkhart underwent magnetic resonance imaging ("MRI") on her abdomen and "there was no significant dilation of the common duct or other abnormality of the biliary system" [Tr. 587].

22

Finally, many of the notes made in 2010 show that the case managers encouraged Ms. Burkhart to find work or to make an appointment with vocational rehabilitation [Tr. 636, 640, 642, 644, 646, 648, 650, 657, 705].

Finally, the ALJ only gave the state agency medical and psychological consultants some weight [Tr. 28]. The ALJ explained that their opinions deserve some weight "particularly in a case like this[,] in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision)" [Tr. 28]. Therefore, the ALJ noted that there were several reasons for her finding, and she explained her reasons throughout the decision.

### C.    Adverse Credibility Finding

Plaintiff argues that the ALJ's adverse credibility finding was wrong for a number of reasons. First, she asserts that an adverse credibility finding is not supported by substantial evidence if a claimant's testimony regarding mental impairments is consistent with the evidence in the record [Doc. 14 at 20]. Second, she asserts that the ALJ mischaracterized the evidence [Id.].

The ALJ discussed Ms. Burkhart's credibility in length and explained a number of reasons for finding her not entirely credible [Tr. 20-27]. First, the ALJ discussed Ms. Burkhart's alleged physical disorders and found that the medical evidence did not support the alleged severity [Tr. 20-22]. Next, the ALJ compared Ms. Burkhart's complaints with her daily activities and found them to be inconsistent [Tr. 24]. For example, the ALJ explained that Ms. Burkhart engaged in the following daily activities: various

23

household chores, cooking, riding the bus, shopping for food, going to church, feeding wildlife, caring for numerous pets, visiting and caring for a disabled neighbor, playing on the computer, doing crossword puzzles, and taking care of three dogs and four rats [Tr. 24]. The ALJ concluded that these activities were not consistent with an individual who is allegedly suffering from physical and mental disabilities [Tr. 24]. The ALJ added that although Ms. Burkhart's daily activities are "fairly limited," it is not because she is disabled but for other reasons [Tr. 24]. Moreover, the ALJ noted that Ms. Burkhart continued to work or at least seek work despite her alleged disabilities [Tr. 25].

With regard to Ms. Burkhart's mental impairments, the ALJ noted that Ms. Burkhart's "diagnosis of a personality disorder with histrionic features alone suggests that she has a tendency to exaggerate and embellish" [Tr. 25] (emphasis in original). In addition, the ALJ stated that treating records indicate Ms. Burkhart's "dramatic affect, vague, and 'entitled' presentation" [Tr. 25]. The ALJ also explained that Ms. Burkhart had not received the type of medical care for a totally disabled individual and that she relied upon certain services, not for medical needs, but for basic needs [Tr. 25-26]. In addition, the ALJ stated that Ms. Burkhart had a history of litigiousness and was "dramatic about wanting benzodiazepines" [Tr. 22].[10] The ALJ also noted that while she "cannot definitively ascertain [Ms. Burkhart's] subjective motivation for obtaining benefits, overall, the record clearly demonstrates a need for additional household

_____

[10] A note from HRMC shows that Ms. Burkhart was not prescribed benzodiazepines because of her extensive history of poly substance abuse, including cocaine, acid, valium, Quaaludes [Tr. 482]. Ms. Burkhart reported that she stopped using drugs in 1987 and that she never actually abused drugs [Tr. 482].

income[,] while the record as a whole fails to demonstrate a legitimate need based upon disability" [Tr. 27].

The ALJ also found that Ms. Burkhart had not been entirely compliant with taking her prescription medication [Tr. 26]. In addition, the ALJ explained several inconsistencies in the record, including: (1) whether Ms. Burkhart drove; (2) Ms. Burkhart's employment status and ability to work; (3) suicidal behavior; and (4) military status [Tr. 25-27]. The ALJ explained that "[a]lthough the inconsistent information provided by [Ms. Burkhart] may not be the result of a conscious intention to mislead, nevertheless[,] the inconsistencies suggest that the information provided by [her] generally may not be entirely credible" [Tr. 27]. Finally, the ALJ concluded that "[o]verall, [Ms. Burkhart's] allegations are overstated and generally unreliable" and that her "descriptions of the severity of her limitations have at times been so extreme as to appear implausible" [Tr. 25].

"In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." *Walters*, 127 F.3d at 531. In *Duncan v. Sec. of Health & Human Servs.*, the court articulated the standard for evaluating subjective complaints:

> First, we examine whether there is objective medical evidence in an underlying medical condition. If there is, we then examine (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

801 F.2d 847, 853 (6th Cir. 1986).  The ALJ's findings regarding credibility "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531.  However, the ALJ's finding must be supported by substantial evidence. *Id.*  Finally, "discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*

After carefully reviewing the entire record, the Court finds that there is no reason to disturb the ALJ's credibility determination.  As described above, the ALJ discussed the objective medical evidence and found it to be inconsistent with Ms. Burkhart's alleged severity [Tr. 26].  In addition, the ALJ explained several reasons for finding that Ms. Burkhart was not entirely credible [Tr. 24-27].  For the reasons set forth below, the Court finds that the ALJ's creditability determination is supported with substantial evidence.

### 1.    Ms. Burkhart's Testimony

First, although plaintiff argues that an adverse credibility finding is not supported by substantial evidence when a claimant's testimony is consistent with medical and other lay evidence, she does not provide any factual support for this allegation. The Court will not engage in speculation as to what parts of the testimony plaintiff is referring.  To the contrary, and as the ALJ noted, Ms. Burkhart's testimony was somewhat inconsistent with the evidence in the record.  For example, Ms. Burkhart testified that she had never been in the military, but she told Dr. Crawford that the military had "let her go," and a note from HRMC stated that Ms. Burkhart reported that she joined the military briefly

26

and was honorably discharged after six weeks in basic training [Tr. 41, 346, 499]. In addition, at the hearing, she testified that she had attempted to kill herself seven times [Tr. 44]. According to Dr. Crawford's own notes, "[Ms. Burkhart] told one worker she had no history of suicide attempts but told me she had overdosed about three times and tried to drive her car into the door of an ambulance once but she 'missed the door'" [Tr. 345]. The ALJ concluded, "[a]lthough inconsistent information provided by [Ms. Burkhart] may not be the result of a conscious intention to mislead, nevertheless[,] the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable" [Tr. 27]. The ALJ's conclusion was not made in error.

### 2. Mischaracterizing the Evidence

Plaintiff also argues that the ALJ mischaracterized certain evidence [Doc. 14 at 20]. Plaintiff cites a case manager's note from HRMC and several statements in the record to demonstrate how the ALJ allegedly mischaracterized the evidence. In addition, plaintiff argues that the ALJ failed to acknowledge Dr. Breslin's note regarding Ms. Burkhart's credibility [Id. at 19].

### a. The Case Manager's Note from HRMC

Plaintiff argues that the ALJ misinterpreted a note from HRMC and that the ALJ did not acknowledge the note in its entirety [Doc. 14 at 20].

The disputed HRMC note was made on January 5, 2010, and states the following: "Bipolar II Disorder; Anxiety Disorder NOS; Rule out Caffeine-induced Anxiety Disorder; and Personality Disorder NOS with histrionic features" [Tr. 725]. The ALJ

found that Ms. Burkhart's "diagnosis of a personality disorder with histrionic features alone suggests that [she] has a tendency to exaggerate and embellish" [Tr. 25] (alteration in original). Plaintiff argues that the correct interpretation of the note is that the provider ruled-out both caffeine-induced anxiety disorder and personality disorder.[11] The Commissioner argues that the provider ruled-out only caffeine-induced anxiety and not the diagnosis of personality disorder, NOS, with histrionic features.

The Court finds the ALJ's interpretation of the note was fair (each of the separate findings being separated by a semicolon) and that other evidence in the record supports the ALJ's interpretation. For example, on October 4, 2006, Michael Waltke, CMSW, noted that Ms. Burkhart's diagnosis included: Axis I—Bipolar II Disorder, Anxiety Disorder NOS, Rule Out Caffeine-induced Anxiety Disorder; Axis II—Personality Disorder NOS with histrionic features [Tr. 496]. In addition, on November 3, 2006, Sharon Chastain, M.D., made the same note [Tr. 492]. Dr. Chastain stated that Ms. Burkhart had been diagnosed with a personality disorder, NOS, because she appeared to present in a very exaggerated and dramatic manner [Tr. 500]. Dr. Chastain believed that Ms. Burkhart had histrionic traits but further assessment was needed [Tr. 500]. These notes support the ALJ's interpretation of the January 5 note.

---

[11] Plaintiff does not dispute the ALJ's finding at Step Three that Ms. Burkhart suffers from a personality disorder.

More importantly, even if the ALJ's interpretation of the note was incorrect, the Court finds it to be harmless. A further review of the January 5 note shows that the provider also stated that Ms. Burkhart experienced "BPD with histrionic features" [Tr. 725]. Therefore, the ALJ's conclusion that Ms. Burkhart's diagnosis demonstrates that she "has a tendency to exaggerate and embellish," is consistent with the treatment note, regardless of whether Ms. Burkhart has bipolar disorder, a personality disorder, or both.

Finally, plaintiff argues that the ALJ did not acknowledge the entire January 5 note [Doc. 14 at 20]. Specifically, plaintiff states that the note also stated that Ms. Burkhart's appearance was disheveled, mood was depressed, and her GAF score was 49 [*Id.*]. First, as mentioned above, it is well-established that the ALJ does not have to address every piece of evidence. *See Boseley*, 397 F. App'x at 199. In addition, although plaintiff accuses the ALJ of "selectively cho[osing]" portions of the record to support her conclusion, plaintiff fails to mention that the note also states that Ms. Burkhart's depression was improved with medications and that all other categories, besides appearance and mood, were normal [Tr. 725, 728]. Accordingly, plaintiff's argument is not well-taken.

### b. Inconsistent Statements

Plaintiff argues that the ALJ erred by finding that Ms. Burkhart made several inconsistent statements with regard to her ability to drive and work [Doc. 14 at 21]. The Commissioner responds that the record contains several references to Ms. Burkhart's attempt to work and ability to drive [Doc. 21 at 13-14].

29

The ALJ found that Ms. Burkhart made several inconsistent statements. One such statement, the ALJ wrote, was Ms. Burkhart's allegation that she does not drive [Tr. 26]. The ALJ stated a case management note made on January 5, 2010, indicated that Ms. Burkhart had borrowed her neighbor's van [Tr. 26]. In addition, the ALJ noted that another case management note made on January 15, 2010, also indicated that Ms. Burkhart drove to her appointment [Tr. 26].

There are several notes in the record that indicate Ms. Burkhart drove on many occasions. For example, on January 2, 2007, Ms. Burkhart reported that she drives [Tr. 486]. On October 19, 2007, Ms. Burkhart stated that she had an interview with Brinks Security, but she did not have any gas to get there [Tr. 441]. Several days later, a social worker reported that Ms. Burkhart stated, "I got some gas over the weekend, my brother finally gave in . . ." and that she was leaving early for her interview [Tr. 439]. A note from September 13, 2009, stated that Ms. Burkhart "can drive" [Tr. 568]. On January 5, 2010, Ms. Burkhart reported "that she borrowed her neighbor's van today and that the window won't roll up" [Tr. 729]. The following day, Ms. Burkhart "showed [the case manager] her car[,] and [Ms. Burkhart] was not able to get the window up" [Tr. 724]. Ms. Burkhart stated that "this was a friend[']s car and that [she] got very cold driving to and from her app[ointment]" [Tr. 724]. At the hearing, Ms. Burkhart testified that she does not have her license because she experienced blackouts [Tr. 40]. She then claimed that her license was suspended, but she could not remember why it had been suspended

[Tr. 40].[12]  There is also evidence in the record that shows Ms. Burkhart frequently took the bus or had her case manager pick her up.  In addition, in September 2007, Ms. Burkhart reported to her case manager that she was angry with her brother for not paying her car payment and that her car was repossessed [Tr. 459].

The Court is unclear whether Ms. Burkhart drove on occasion, or whether she stopped driving because her car was repossessed, or whether she stopped driving because she had no money for gas, or whether she could not drive because of her alleged blackouts, or whether she is prohibited from driving because her license was suspended for some unknown reason. This Court, however, cannot "resolve conflicts in the evidence." *Walters*, 127 F.3d at 528.  Accordingly, the Court finds that the ALJ's interpretation is a fair reading of the evidence.

Finally, plaintiff argues that the ALJ erred by stating that Ms. Burkhart's efforts at seeking employment is "inconsistent with this application appeal" [Doc. 14 at 21]. Plaintiff cites *Walston v. Gardner*, 381 F.2d 580 (6th Cir. 1967), to support her assertion [*Id.*].  In addition, she argues that while the ALJ uses the words, "multiple occasions," to describe how many times the case manager encouraged Ms. Burkhart to seek employment, the ALJ only provided one cite. [*Id.*]

---

[12] The Court notes that Ms. Burkhart reported she was charged with a DUI in 2006 [Tr. 496].  On November 15, 2007, she stated that had been to court over an old DUI charge [Tr. 436]. She stated that she went to court and was appointed an attorney and that she did not have to go back until the next year [Tr. 436].  On April 13, 2010, Ms. Burkhart reported that she went to court and all her charges were dismissed and that she would only have to pay court costs [Tr. 666].  It is unclear if her reported court appearance in 2010 was related to her DUI charge in 2006 and whether her DUI charge is the reason for her suspended license.

Plaintiff's reliance on *Walston v. Gardner* is misplaced. In *Walston*, the Sixth Circuit held, "[w]here an applicant has unsuccessfully attempted to secure employment, less evidence is needed to support a finding of disability than where the applicant has made failed to make such an effort." 381 F.2d at 586-87. Later, the Sixth Circuit explained:

> In *Walston*, the court reversed a determination that a claimant was not disabled by noting that claimant's efforts to find employment were hindered by constant back pain following an accident years before. The court in *Walston* thus made this statement as further proof that the claimant really did suffer from a disability, not as a general evidentiary standard.

*Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 843 (6th Cir. 2005). In *Pasco*, the court rejected the plaintiff's argument that *Walston* required "the ALJ to infer that she is truly disabled from her attempts to work." *Id.*

In the instant matter, Ms. Burkhart maintained employment and tried to find jobs after her alleged onset date of disability. She was unable to secure a job for reasons not involving her alleged disability. For example, in August 2007, she was employed on a two-month contract for a telephone technical support agency [Tr. 453]. At the end of the contract, Ms. Burkhart reported that she was going to find employment elsewhere even though she believed she was disabled and had to miss work often [Tr. 453]. However, as stated by the ALJ, "this job ended, not because of any of [Ms. Burkhart's] allegedly disabling impairments, but because she had a two-month contract with the agency, and the assignment was over" [Tr. 25]. On December 11, 2007, although Ms. Burkhart claimed she could not work because her diabetes, she also claimed that she had been

32

hired as a bill collector and that she was supposed to start in January [Tr. 434]. Ms. Burkhart also had an interview with Brinks Security [Tr. 441]. In addition, Ms. Burkhart reported to a case manager that no one would hire her and that she was looking for employment [Tr. 644, 650, 654]. Accordingly, the Court finds that plaintiff's argument is not well-taken.

Finally, plaintiff argues that the ALJ used the words "multiple occasions" to describe Ms. Burkhart's case managers' attempts to encourage Ms. Burkhart to seek employment but only cited to one treatment note. A review of the record shows that Ms. Burkhart's case managers told her on "multiple occasions" to look for work [Tr. 636, 640, 642, 644, 646, 647, 650, 657, 705].[13] Accordingly, the Court finds plaintiff's argument unavailing.

### c. Frances Breslin, Ph.D.

Plaintiff argues that the ALJ ignored Dr. Breslin's findings [Doc. 14 at 19]. She asserts that Dr. Breslin opined that Ms. Burkhart was not fully credible but that her credibility was "more related to her mental illness than any attempt to deceive." [*Id.*] (citing Tr. 549). However, the ALJ explicitly found, "Although the inconsistent information provided by [Ms. Burkhart] may not be the result of a conscious intention to

---

[13] Because the Plaintiff asserts that the ALJ took one treatment note out of context, the Court will summarize several of the treatment notes. On June 4, 2010, the case manager reported that Ms. Burkhart continued to hope someone else would pay her utility bill [Tr. 642]. The case manager encouraged Ms. Burkhart to find "at least a part time job" [Tr. 642]. On June 6, 2010, the case manager set the goal for Ms. Burkhart to find work so that she could pay her utility bill [Tr. 640]. On July 1, 2010, the case manager "encouraged [Ms. Burkhart] to find work and to continue contacting Voc. Rehab" [Tr. 636]. The case manager made several other notes for Ms. Burkhart to find work. [Tr. 644, 646, 647, 650, 657, 705]. Clearly, the ALJ did not take the treatment notes out of context.

33

mislead, nevertheless[,] the inconsistencies suggest that the information provided by [her] generally may not be entirely reliable." Accordingly, the Court finds that plaintiff's argument is not well-taken.

## C. Failure to Call Vocational Expert

Plaintiff argues that the ALJ erred by failing to call a vocational expert to testify [Doc. 14 at 22]. In addition, she asserts that the ALJ's reliance on Social Security Rulings 83-14 and 85-15 was erroneous [*Id.*]. Plaintiff contends that the only vocational evidence in the file are Exhibits 5E and 8E, which her counsel objected to because the record contains no information about the individuals' professional qualifications to make vocational assessments, nor was there an opportunity to question their conclusions [*Id.*].

The Commissioner responds that plaintiff failed to show that she had nonexertional limitations on her ability to work that would have precluded the use of the Grids. [Doc. 21 at 15].

The ALJ found that considering Ms. Burkhart's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that she could perform [Tr. 29]. The ALJ stated Ms. Burkhart was able to perform medium work with several additional limitations [Tr. 29]. The ALJ noted, however, that "the additional limitations have little or no effect on the occupational base of **unskilled medium** work." [Tr. 29]. The ALJ cited Social Security Ruling 83-14 to support the assertion that limitations in climbing ladders, ropes, and scaffolds would not significantly affect the occupational base [Tr. 29]. In addition, the

34

ALJ cited Social Security Ruling 85-15 to support the assertion that Ms. Burkhart's need to avoid exposure to work hazards, such as unprotected heights and dangerous moving machinery, does not have a significant effect on work that exists at all exertional levels [Tr. 29]. Finally, the ALJ stated that Ms. Burkhart was able to "adapt to the mental demands for at least unskilled work" [Tr. 29].

The Court finds the plaintiff's argument not well-taken. Plaintiff asserts that the ALJ's reliance on SSR 83-14 was erroneous, but she fails to offer any explanation to support her argument. *See McPherson v. Kelley*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citations omitted)). Furthermore, the ALJ used SSR 83-14 to support her finding that the inability to climb ladders, ropes, and scaffolds would not significantly affect the occupational base [Tr. 29]. Social Security Ruling 83-14 states that the inability to ascend or descend ladders and scaffolding does not significantly affect the occupational base at the medium level of exertion. 1983 WL 31254, at *5 (1983).

In addition, plaintiff contends that SSR 85-15 does not apply because it only pertains to nonexertional limitations. As mentioned above, the ALJ used SSR 85-15 to support her finding that avoiding exposure to work hazards, such as unprotected heights and dangerous moving machines, does not have a significant effect on work that exist at all exertional levels. Social Security Ruling 85-15 indicates that restrictions on unprotected elevations and being near dangerous moving machinery does not

significantly affect work that exists at all exertional levels. 1985 WL 56857, at *3 (1985). While the ALJ limited the Plaintiff to the medium level of exertion, no other exertional limitations were imposed, and thus, it was proper to rely on SSR 85-15. Accordingly, the Court finds no error.

Finally, the Plaintiff argues that she objected to the vocational evidence in the file and that no weight should be given to this evidence. The Court finds the Plaintiff's argument unavailing because the ALJ did not use this vocational evidence to support her decision.

## VI.    CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Judgment on the Pleadings [Doc. 13] is **DENIED**, the Commissioner's Motion for Summary Judgment [Doc. 20] is **GRANTED**, and this case will be **DISMISSED**.

IT IS SO ORDERED.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE


ENTERED AS A JUDGMENT

s/ Debra C. Poplin
CLERK OF COURT

36